UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CATHERINE DIVERS,

                              Plaintiff,

           -against-

METROPOLITAN  JEWISH  HEALTH  SYSTEMS
and TERESA CAMBRINI,

                              Defendants.
-------------------------------------------------------------------X

**MEMORANDUM &
ORDER**

06-CV-6704 (RRM) (JMA)

A P P E A R A N C E S:

Chidi Anthony Eze, Esq.
255 Livingston Street, 4th Floor
Brooklyn, NY 11217
(718) 643-8800
           *Attorney for Plaintiff*

Philip A. Goldstein
Michael J. DiMattia
McGuire Woods LLP
1345 Avenue of the Americas, 7th Floor
New York, NY 10105-0106
(212) 548-7009
           *Attorneys for Defendants*


**AZRACK**, **United States Magistrate Judge:**

           Plaintiff Catherine Divers commenced this action against defendants Metropolitan Jewish

Health Systems and Teresa Cambrini on December 20, 2006.   She claims employment

discrimination based on race and sexual orientation in violation of the Civil Rights Act of 1861,

42 U.S.C. § 1981, the New York State Executive Law § 296, and the Administrative Code of the

City of New York §8-107(a) and denial of medical leave in violation of the Family and Medical

Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. She also alleges common law assault, battery, intentional and negligent infliction of emotional distress, and tortuous interference with contractual relations. Defendants have moved for summary judgment on all claims and the parties have consented to decision by the Magistrate Judge. For the reasons discussed below, summary judgment is granted on all § 1981 and FMLA claims and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I. BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements and the depositions, affidavits, declarations, and other documents they each submitted in connection with defendant's motion for summary judgment.[1] Factual disputes are noted.

Plaintiff, Catherine Divers ("Plaintiff" or "Divers") a black, heterosexual female, is a registered nurse. (Divers Dep. 7:7, Aug. 15, 2007; Divers Aff. ¶ 1, May 25, 2008). Defendant Metropolitan Jewish Health Systems ("MJHS") is a New York corporation that provides, among other things, at home nursing services through its various divisions, which are organized as a network of geriatric health maintenance organizations. (Def.'s R. 56.1 Statement ¶ 3 ("Def. 56.1").) Between 2000 and 2006, Divers maintained a full-time position with MJHS while concurrently serving as a *per diem* fee-for-service nurse both within and outside the MJHS network. Her employment was at will at all times. (Def. 56.1 ¶ 10.) Defendant Teresa Cambrini ("Cambrini"), a white homosexual female, was one of two of Divers' direct

---

[1] Plaintiff failed to comply with Local Rule 56.1 in that she failed to follow her statements of fact with a "citation to evidence which would be admissible" relying instead, in many instances, "upon information and belief." While the Court may therefore disregard plaintiff's facts and rely solely upon defendants' Rule 56.1 statement as the uncontested facts of the case, the Court exercises its "broad discretion" to overlook plaintiff's defective Rule 56.1 statement. DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R., 237 Fed. Appx. 642, 646 (2d Cir. 2007). Thus, after conducting an "assiduous review of the record," the Court considers plaintiff's facts, where supported by admissible evidence, in reaching its conclusions. Id. (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)).

supervisors during Divers approximately two year tenure at the Long Term division of MJHS. (Def. 56.1.)

Divers resigned from Long Term effective August 3, 2006 but continued to perform *per diem* services for MJHS until September. She ended her employment with MJHS entirely on September 18, 2006. (Rimler Decl. Ex. H; Divers Aff. ¶ 22.) She commenced this action on December 20, 2006, alleging, in sum, that MJHS discriminated against her by denying her requests for transfers, medical leave, and medical accommodations, by withholding or delaying her disability benefits on account of her race and sexual orientation, and by constructively discharging her. She further alleges that Cambrini subjected her to a hostile work environment on account of her race and sexual orientation by being aggressive and verbally abusive and physically threatened and assaulted her.

## A. Alleged Incidents of Racial Discrimination

Divers did not initially allege any discriminatory or otherwise negative working conditions regarding her employment with MJHS prior to transferring to Long Term. (Divers Dep. 102:4; see also, generally, Compl.) Indeed, she testified at her deposition that she was satisfied with her working conditions at her prior divisions and had positive working relationships with the supervisors there. (Divers Dep. 102:4–25.) However, in her response to defendant's motion for summary judgment, Divers, for the first time, alleges two incidents of mistreatment that occurred before her transfer to Long Term. She alleges that in late 2000 or early 2001, after the division she had been working for was dissolved, her white colleagues were allowed to choose their new departments, whereas she was forced to work as a social worker instead of as a nurse in accordance with her education and training (Divers Dep. 98:8–99:8; Divers Aff. ¶ 5.) When Divers protested the reassignment, a human resources representative

informed her it was a mistake and advised her to file a formal complaint. However, Divers declined to pursue the matter further because "as a single-parent [sic] without monetary support from any other source" she "had little or [no] option but to remain in the role of a social worker." (Divers Aff. ¶ 5.) Divers was eventually transferred to a nurse position in the First to Care division shortly thereafter in May 2001. Divers further alleges for the first time in her opposition papers that in May 2004, while working at First to Care, she was issued an ultimatum between transferring to the Manhattan branch or quitting and was given only two days to decide while "similarly situated white employees did not encounter such [a] dilemma." (Divers Aff. ¶ 5).

With one exception noted below, Divers' remaining allegations of discrimination all occurred while she was a CHN supervisor at Long Term between June 2004 and her resignation in August 2006. Divers initially applied for a *per diem* position with Long Term. However, during the interview, which was conducted by Long Term supervisors Sandra Schau ("Schau") and Cambrini together, she was instead offered a fulltime community health nurse supervisor ("CHN supervisor") position. (Divers Dep. 63:23–64:10.) According to Divers, Schau was solely responsible for recruiting and hiring Divers for this position. (Pl. 56.1 ¶ 3.) According to the defendants, Cambrini also played a role. (Schau Decl. ¶ 20.) The new position constituted a promotion, so Divers accepted the offer and transferred to Long Term in June 2004.[2] (Divers Dep. 63:9; 63:16–19.) While at Long Term, Divers was officially assigned to work under Cambrini but could elect to seek advice, authorization and supervision from either Schau or

---

[2] As a CHN supervisor, Divers was in charge of a team of approximately thirty-five field nurses. Her job duties included reviewing patient files, assigning nurses to patients, visiting patients when a field nurse was unavailable, and conducting field visits to supervise the nurses on her team. Divers testified during her deposition that when she started at Long Term, she spent twenty percent of her time in the field but by the end, she spent up to seventy percent of her time in the field. However, Divers disputes defendants' assertion that the CHN supervisor position is primarily a field job. (Def. 56.1 ¶ 63; Pl.'s Response to Def.'s Rule 56.1 Statement at D:56–64.) The CHN supervisor job description submitted by defendants indicates that the physical demands of the position included, among other things, occasionally lifting greater than fifty pounds and kneeling and crouching. (Schau Decl. Ex. A at 6.)

Cambrini. (Divers 119:3; 120:10–14.) Defendants assert that Divers reported primarily to Schau. (Schau Decl. ¶ 10.) Divers disputes this but admits that she had a good relationship with Schau and felt comfortable with Schau even while working under Cambrini. (Divers Dep. 119:20–120:9.)

According to Divers, Cambrini began discriminating against her immediately upon her arrival at Long Term. Divers alleges that upon returning to her desk after a restroom break on her first day, she discovered a note from Cambrini on her computer stating that Cambrini needed to know where Divers was at all times, including when Divers was in the bathroom. (Compl. ¶ 15; Divers Aff. ¶ 8.) Divers asserts that no white employees were subjected to this condition. She submitted no evidence establishing the reporting or break practices imposed upon her white colleagues. (Compl. ¶ 15; Divers Aff. ¶ 8.) Cambrini has no recollection of the note. (Cambrini Dep. 32:2–10.)

The next day, Divers reported the incident to Sharon Rimler in the MJHS human resources department and requested a transfer back to First to Care in light of the "hostile treatment [she] suffered [at] the hands of Terri Cambrini . . . and which [she] sensed [would] continue unabated." (Divers Aff. ¶ 9.) Divers complained to Rimler that Long Term was a bad working environment and that Cambrini often raised her voice but she did not allege race or sexual orientation discrimination at that time. (Rimler Decl. ¶ 13; Divers Dep. 76:16–77:25.) Rimler denied Divers' transfer request citing MJHS's policy against transferring employees before they have completed at least one year of service in their current department. (Compl. ¶ 16; Divers Aff. ¶ 9.)

Divers alleges that her white colleagues were not held to the same one year restriction on transferring between departments and offers Dorothy Kourt as an example. (Compl. ¶ 16; Divers

Aff. ¶ 10.)  MJHS confirms that its transfer policy includes a "general rule to recommend people staying in their role for a year" but asserts that exceptions are made to meet the operational needs of the organization.  (Rimler Decl. ¶ 10.)  Defendant's policy statement also explicitly "reserves the right to transfer employees when it is deemed necessary."  (Rimler Decl. Ex. D at 2.)  MJHS further admits that Kourt was transferred to Long Term in June 2004 after serving less than one year in her previous department, but asserts that Kourt's transfer was necessary to alleviate the staffing crisis that Long Term was experiencing at the time.  (Cammarano Dep. 23:21–24:24.)  According to MJHS, less than one month before Divers resigned, it had decided to hire a third CHN supervisor to facilitate the department's expansion.  (Rimler Decl. ¶ 24.)  However, before that position could be filled, both Divers and the other CHN supervisor at the time, Beatrice Sylvester, submitted letters of resignation.  (Rimler Decl. ¶¶ 25–28.)  Thus, at the time Kourt was transferred to Long Term, each of the three and only CHN supervisor positions were vacant or about to be vacated.  (Rimler Decl. ¶ 29.)  Divers acknowledges that Long Term had substantial staffing difficulties throughout her employment there.  (Divers Aff. ¶ 14.)

Divers also alleges, for the first time in her summary judgment opposition papers, that in hiring Kourt, MJHS was attempting to force her to quit.[3]  (Divers Aff. ¶ 11.)  Her belief is based on the fact that MJHS posted the opening for the position Kourt eventually filled in March 2006 while Divers was on a four to six week medical leave of absence.  (Divers Aff. ¶ 11.)  MJHS asserts that it posted the opening in May 2006, by which time Divers had returned to work. (Rimler Decl. ¶ 24; Ex. F.)  MJHS further explained that it intended the new hire to fill the newly created third CHN supervisor spot and to thus supplement, not replace, Divers.  (Rimler Decl. ¶ 24.)  MJHS maintained the three CHN supervisor positions after Divers' resignation.

---

[3] The Court overlooks plaintiff's failure to allege these facts in her complaint as the complaint does include a general allegation of constructive discharge.

After her request to transfer was denied, Divers continued to work under Cambrini at Long Term for the next year and then renewed her request to transfer out of that department. (Compl. 17.)  This time, Divers was permitted to transfer but elected to remain at Long Term because the transfer position MJHS offered required weekend work and was housed in the same building as Cambrini.  (Compl. 17).  Defendants informed Divers of an opening in her old department, First to Care, on February 20, 2006.  (Rimler Decl. ¶ 17).  The position was supervisory but would have constituted a demotion.  (Rimler Decl. ¶ 18.)  Divers applied for the position but went on personal leave shortly thereafter and, according to MJHS, failed to pursue the matter after her return.  (Rimler Decl. ¶ 17; Ex. E).  Divers consequently remained at Long Term.  (Compl. 17.)

The next several incidents of alleged discrimination occurred after Divers slipped on ice near her workplace and injured her back in January of 2005.  Divers alleges that when she attempted to report the incident to Cambrini for Worker's Compensation purposes, Cambrini called her a liar and that neither Cambrini nor anyone else from MJHS filed the necessary paperwork despite Divers' repeated inquiries.  (Compl. ¶ 23; Divers Dep. 189:14–23; Compl. ¶ 23.)  Divers alleges that though she eventually received her benefits in May 2005 after retaining an attorney, similarly situated white employees were able to obtain Workers' Compensation claim numbers within one week of their accidents.  (Divers Aff. ¶ 12.)  However, she provided no evidence of how MJHS handled Workers' Compensation claims submitted by other employees.  MJHS asserts that the proper forms were timely submitted and produced a copy of an MJHS report to the state Workers' Compensation Board, which indicates that the fall occurred on January 24, 2005 and that the report was prepared on February 1, 2005.  (Pignataro Decl. Ex. A.)  Defendants also submitted a copy of the Workers' Compensation Board Notice of

Decision which indicates that Divers was awarded Workers' Compensation benefits on September 1, 2005. (Pignataro Decl. Ex. B.)

Divers further alleges that MJHS, through defendant Cambrini, as well as Schau and Cammarano, denied her requests for leave to attend doctors' appointments. Specifically, they denied Divers request to either come in late every other Tuesday or leave early every other Friday from January through June 2005 to attend physical therapy appointments.[4] (Compl. ¶ 24; Divers Dep. 152:17–157:17; 155:19–25.) Defendants assert that they denied the request because Divers gave no reasons why she could not visit the doctor outside of the workday and because Fridays are a "critical operating time." (Cammarano Dep. 45:23.) Divers was nonetheless able to receive the necessary physical therapy three times a week by visiting her doctor after work or taking vacation or sick leave. (Divers Dep. 158:11–159:8). However, she alleges that similarly situated white employees never had trouble getting reasonable time off for doctors' visits. (Compl. 24). Divers specifically cites, without elaborating, Raymond Leirman as an example of a white employee that was permitted to take time off for doctors' appointments. (Compl. ¶ 24). Divers submitted no evidence establishing how MJHS treated such leave requests by other employees. Divers admits that she was granted medical leave on other occasions, including ten days in 2003 for injuries from a non-work related car accident and four to six weeks in 2006 after a surgery (Divers Dep. 15:1–22; Divers Aff. ¶13).

Divers also alleges that she was denied a request for five months of "light duty" or "desk duty," in accordance with her doctor's recommendation while MJHS so accommodated other employees. Divers asserts that in August 2005 she noticed at least three other employees,

---

[4] Divers offers conflicting evidence regarding the exact amount of leave she requested. Her complaint suggests it was a one-time request to leave early on a single day. In her affidavit, Divers describes repeated requests to leave half an hour early. (Divers Aff. ¶ 16.). During her deposition, she testified that she would have been out of the office for several hours on the day of the appointments. (Divers Dep. 156:12–157:157:10.)

including Ivy Brown, Carol Henry, and a secretary named Barbara, working with a leg or arm cast. (Compl. ¶ 25.) Henry and Brown, who are both black and both described their positions as "primarily desk job[s]," both deny requesting light duty and deny wearing leg braces or casts to work. (Henry Decl. ¶¶ 2, 4, 6, 9; Brown Decl. ¶¶ 2, 6, 8, 11.) Henry admits that she wore an ace bandage and ankle support for two days (Henry Decl. ¶ 7) and Brown admits that she periodically wore an ace bandage for a portion of the workday. (Brown Decl. ¶ 9.)

MJHS asserts that it denied Divers' request for light duty because Divers would not have been able to perform the essential functions of her job if restricted to light duty as her position required her to supervise nurses in the field, care for patients as needed, lift over fifty pounds, kneel and crouch, and lift and turn elderly patients in bed. (Schau Decl. ¶ 16.) Divers admits that she would not have been able to perform the field component of her position while on light duty and offered to have her coworkers complete her field duties while she did their paperwork and other desk duties in exchange. However, defendants rejected this compromise because the paperwork is based on the field supervision and therefore both components needed to be completed by the same person. After MJHS denied Divers' request for light duty, Divers contacted her doctor who then lifted the restrictions and Divers returned to Long Term in her normal capacity. Divers offered no evidence establishing the manner in which MJHS handled other employees' requests for medically related work accommodations, if any.

Divers further alleges that defendants withheld her New York State disability benefits on account of her race. (Divers Aff. ¶ 13.) Divers claims that she was supposed to receive a benefit check for a four to six week medical leave of absence that she took beginning March 2, 2006. (Divers Aff. ¶13.) Divers asserts that the state office told her that her check had been forwarded to MJHS but that MJHS never gave it to her whereas similarly situated white employees received

their disability benefits from MJHS "within a reasonable time." (Divers Aff. ¶ 13; Compl. ¶ 27.) According to documents submitted by MJHS, MJHS's short-term disability benefits insurer, First Unum Life Insurance Company, awarded Divers short-term benefits on April 25, 2006. (Pignataro Decl. Ex. C.) On May 9, 2006, Divers submitted a written statement rejecting the short term award because she was advised that she would be entitled to a greater award if she submitted a claim for state benefits instead. (Divers Dep. 193–95; Pignataro Decl. Ex. C.) The state Workers' Compensation Board subsequently denied Divers' claim. (Divers Dep. 194:11–19.) MJHS asserts that Divers never reapplied for short term benefits and denies withholding any benefits from her. (Pignataro Decl. ¶ 16.)

On June 27, 2006, Divers submitted a letter of resignation from Long Term effective August 3, 2006. (Rimler Dec. Ex. H.) In her resignation letter, Divers expressed thanks for the opportunity to work with "a reputable organization such as [MJHS]" and stated that it had "been truly a learning experience." (Rimler Dec. Ex. H.) MJHS asserts that Divers resigned because she was finally executing her longtime plan to relocate to Rochester, where she had family and other ties and where she would be able to move into a larger house, which would have helped her and her husband gain custody of her stepdaughter. Divers admits that before resigning, she requested reduced hours so that she would have time to deal with the custody matters but asserts that Cambrini was the sole reason she resigned. However, she also stated that if she had been permitted to transfer to a different department and to cut back on her hours, she would have remained at MJHS. (Divers Dep. 53:13–58:6.)

The final incident of discrimination alleged in the complaint occurred on July 13, 2006. On that date, Divers and Cambrini had both assigned two different nurses to the same patient. (Cambrini Dep. 7:4–24; Divers Dep. 273:13–274:4) Cambrini called Divers on the telephone

while the two were at work to investigate the error. (Cambrini Dep. 7:25–8:4) Divers alleges that during that phone call, Cambrini was ranting and raving and that she told Divers that Divers would be fired if she ever spoke again to Tyisha Dukes, another MJHS employee. (Compl. ¶ 19.) The conversation then ended. (Compl. ¶ 20; Divers Dep. 241:15) Divers alleges that moments later, Cambrini "ran down to plaintiff's office to physically attack" her. She alleges that Cambrini stood over her in a threatening posture, screamed and verbally abused her, banged her fists on the desk, and threatened to physically hit her. (Compl. ¶ 20.) Divers further alleged in her complaint that Cambrini "pulled a chair, sat down, and commanded plaintiff to start talking to her, while at the same time threatening to hit plaintiff if she did not speak." (Compl. 20.) During her deposition, Divers testified that Cambrini pushed a chair into her. (Divers Dep. 260:6–23.) In her summary judgment opposition papers, Divers adds that Cambrini "physically hit me with her body." (Divers Aff. ¶ 17; <u>see also</u> Pl. 56.1 ¶ 16.) Divers speculates that Cambrini told her not to speak to Dukes anymore because Cambrini was sexually attracted to either Divers or Dukes. (Divers Dep. 243:16–12.) Divers testified that her theory is based on the fact that she could not come up with any other conclusion as to why Cambrini would tell her not to speak to Dukes. (243:11–244:22) She submitted nothing to support this theory.

Despite suffering chest pain that night as a result of the altercation with Cambrini, Divers returned to work the next morning. (Compl. ¶ 21.) The chest pain continued and at approximately 11 a.m., a coworker called 911. (Compl. ¶ 21.) Divers was taken to the hospital where she was diagnosed with cardiac arrhythmia and underwent her second cardiac ablation surgery. (Compl. ¶ 21.) She spent the next four days in the hospital. (Compl. ¶ 21.) Divers made a formal complaint regarding the incident to Susan Borenstein, the Director Human Resources on July 18, 2006. (Borenstein Decl. ¶ 3.) Divers described the incident while

Borenstein took contemporaneous notes. (Borenstein Decl. ¶ 3; Ex. A.) Divers told Borenstein that Cambrini slammed a chair into her desk. Divers did not report to Borenstein that Cambrini physically threatened her or hit her with the chair, nor did she tell Borenstein that she believed Cambrini's actions were based on Divers' race or sexual orientation. (Borenstein Decl. ¶ 5, 10, 11; Ex. A.) Divers asserts that MJHS took no action in response to her complaint. (NEED CITE) Barbara Farrell, another Human Resource employee, asserts that she investigated Divers' claim by interviewing Cambrini and four employees that work near Divers' office. (Farrell Decl. ¶¶ 8–9.) None corroborated Divers' allegations so Farrell dropped the matter. (Farrell Decl. ¶ 10.)

In addition to the above complaints, Divers, for the first time in her opposition papers, alleges that MJHS prohibited her from cashing out her retirement account after she resigned from her full time position at Long Term because she was still doing part-time work for MJHS. Divers asserts, without explaining, that "upon information and belief, other similarly situated white employees are allowed to cash out or transfer their [retirement] benefit[s] upon quitting their full-time employment at MJHS" (Divers Aff. ¶ 22.) Defendants confirm that MJHS policy prohibits employees from withdrawing funds from their retirement accounts while still employed at MJHS in any capacity and assert that they know of no MJHS employee in the last eight years that has been permitted to withdraw retirement funds while still employed at MJHS. (Pignataro Decl. ¶¶ 20, 28.) Divers submitted no evidence establishing how MJHS handled other employees' requests to withdraw their retirement account funds.

## B. Complaints regarding Cambrini generally

In addition to the above described specific incidents of discrimination, Divers alleges that Cambrini relentlessly harassed, marginalized, intimidated, and discriminated "against Divers

because of her race, sex, and sexual orientation." (Compl. ¶ 14.) She alleges that Cambrini "repeatedly addressed [her] in a condescending manner, shouted at [her] for no apparent reason, and openly disliked [her] because of a misconception that [she] was after one or two of [Cambrini's] female lovers." (Compl ¶ 29.) Divers further alleges that Cambrini shouted at her at every turn while senior managers looked on and did nothing. (Divers Aff. ¶ 8.) Divers also complained that Cambrini tossed files and papers on her desk instead of handing them to her, cursed and used a forceful and demanding tone, once called her at home about a case, and once called her a bitch at a time she thought Divers could not hear her. (Diver Dep. 88:2–89:8; 90:14–91:12; 93:12–94:11.) Divers asserts that she also witnessed Cambrini behave this way towards Yun Yun Li, a heterosexual Asian American female that was also a CHN supervisor at Long Term. Divers stated that Li and her replacement, Beatrice Sylvester, a heterosexual African American female, both resigned from MJHS because of Cambrini's discrimination. (Pl.'s Response 56.1 ¶ 328.) However, Divers provided no evidence either supporting this allegation or establishing the basis of her knowledge regarding Li's and Sylvestre's motives for leaving MJHS.

Divers allegations of Cambrini's discriminatory and hostile manner are generally supported by Veronica Lowe, a black female CHN supervisor who was hired by Cambrini. (Schau Decl. ¶ 3.) Lowe worked as a Long Term CHN supervisor from October 2006 through June 2007. In her declaration, she asserts that she resigned because Cambrini discriminated against her by making her do most of the less desirable field work while her white colleagues "sat in the office doing very little paper work" and by yelling at her and other black employees for things that white employees were not yelled at for. (Lowe Decl. ¶ 3.) Defendants assert that Lowe resigned in order to pursue a promotional opportunity and that she never complained of

racial discrimination while employed at MJHS. (Second Schau Decl. ¶ 9.) MJHS submitted an employee evaluation in which Lowe appended a handwritten note thanking Cambrini for recognizing her hard work. (Second Schau Decl. Ex. A.)

## C. Divers' efforts to report the allegedly discriminatory behavior

Divers received a copy of MJHS' anti-harassment and non-discrimination polices at the start of her employment and was aware throughout her tenure at MJHS, that she could file complaints about discrimination with the Human Resources Department. (Divers Dep. 314:11–315:9.) However, Divers asserts that, except for the July 13, 2006 confrontation with Cambrini, she made no formal complaints regarding any of the above-described incidents because she was scared of being fired, in part because she believed her other bosses were also gay. (Divers Aff. ¶¶ 9, 14.) Divers asserts that "it is a known fact" that employees that complain about MJHS discrimination are fired but offered no examples to that affect. (Divers Aff. ¶ 15.) She has not identified which other bosses she believes are gay, nor has she articulated her basis for believing they are gay. However, she asserts that she informally complained about Cambrini on several occasions and that MJHS did nothing to help her but she could not identify any specific instances and she could not recall the words she used to convey the issue of race discrimination. (Compl. ¶ 31; Divers Dep. 196:13–202:11). Defendants deny receiving any indication from Divers that she was being discriminated against on account of her race or sexual orientation or otherwise. In her exit interview, which was conducted on September 12, 2006, over a month after her last day at Long Term and six days before she stopped working for MJHS all together, Divers cites Cambrini as her primary reason for leaving. She selected "interpersonal relationship with immediate supervisor" as the least rewarding aspect of her job and wrote that she had a "horrible experience working in Long Term." (Eze Aff. Ex. 7.)

**D. Divers' Performance Evaluations**

Throughout her employment with Long Term, Divers was never subject to disciplinary action and never received a negative performance review. (Cambrini Dep. 32:14–20.) On her December 2004 sixth month evaluation, Cambrini gave Divers a 4 (performance within established standards), in every category except two, in which she gave Divers a 5 (superior). (Goldstein Decl. Ex. H.) In a second evaluation conducted on March 1, 2006, Cambrini gave Divers a 3 (fully meets expectations) in every category. (Schau Decl. Ex. A.) Cambrini wrote that Divers "has continued to grow" and "has continued to work diligently" despite the "increasing shortage of CHN staff." (Schau Decl. Ex. A.) Cambrini's performance review enabled Divers to receive the highest merit raise she was eligible for. (Diver Dep. 144:11–145:10.). Defendants assert that the performance reviews were solely the responsibility of Cambrini. (Schau Decl. ¶ 11.) Divers counters that the reviews were based on input from Schau and Cammarano as well. (Divers Dep. 146:13–20.)

## II. DISCUSSION

**A. Summary Judgment Standard**

Pursuant to the Federal Rules of Civil Procedure, summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that it is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005). Once the moving party has met its initial burden, the opposing party must come forward with specific facts showing that there is a "*genuine* issue of *material* fact" for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The nonmoving party may not rest upon mere

conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed.  R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (citation and quotation marks omitted).  "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'"  Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ .P. 56(e).)  In considering a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (citation and quotation marks omitted).

**B.  § 1981 Claims of Racial Discrimination**[5]

Divers alleges that MJHS and Cambrini discriminated against her on account of her race in violation of the Civil Rights Act of 1861, as amended, 42 U.S.C. § 1981, by (1) taking various discrete discriminatory actions against her, (2) by creating a hostile work environment, and (3) by constructively discharging her.  MJHS and Cambrini move for summary judgment.  In a discrimination action, granting summary judgment merits "an extra measure of caution . . . because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.  Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine

---

[5] Though Divers' claims of sexual orientation based discrimination are intertwined with her claims of racial discrimination, her sexual orientation based claims are not cognizable under § 1981, 42 U.S.C. § 1981; see also Albert v. Carovano, 851 F.2d 561, 571–72 (2d Cir., 1988) (citing Zemsky v. City of New York, 821 F.2d 148, 150 (2d Cir., 1987), and will therefore be addressed separately, *infra*.

issues of material fact."  Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006) (citations and quotation marks omitted).

On a motion for summary judgment, § 1981 claims are analyzed under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Davis v. Avaya, Inc., No. 07-CV-1477, 2008 WL 4442469, at *1 (2d Cir. Oct. 2, 2008).  Under this three part test, plaintiff must first establish a prima facie case of discrimination by showing: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class.  McDonnell Douglas, 411 U.S. at 802.  In addition, a plaintiff seeking personal liability under § 1981 must also demonstrate some affirmative link to causally connect the actor with the discriminatory action.  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (citation and quotation marks omitted).

Once plaintiff satisfies this minimal burden, "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action, "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  Patterson, 375 F.3d at 221 (citations and quotation marks omitted).  If the employer satisfies this standard, the burden shifts back to the plaintiff to show that the defendant's legitimate reasons were a pretext for discrimination.  Id.  To establish pretext, it is not necessarily sufficient for a plaintiff merely to establish the prima facie case and show that the defendant's proffered justifications are false.  James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).  Rather, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports

an inference of . . . discrimination." <u>James</u>, 233 F.3d at 157.  If plaintiff fails to "show that there is evidence that would permit a rational fact finder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." <u>Davis</u>, 2008 WL 4442469, at *1 (quoting <u>Patterson</u>, 375 F.3d at 221).

## 1. <u>Discrete Acts of Alleged Discrimination</u>

Divers alleges numerous discrete acts of discrimination.  In moving for summary judgment against these claims, defendants do not dispute that Divers is a member of a protected class and that she was qualified for her position.  Rather, they challenge the third and fourth elements of Divers' prima facie case by asserting that some of the complained of acts do not constitute adverse employment actions and that none of the actions give rise to an inference of discrimination.  Defendants additionally assert that even if Divers has established a prima facie case, her discrimination claims must fail because their decisions were prompted by legitimate, nondiscriminatory concerns and that Divers has not established that the proffered reasons were a pretext for discrimination.

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000) (citations and quotation marks omitted).  To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Id.</u> (quoting <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993 F.2d 132, 136 (7th Cir. 1993))  Examples of materially adverse actions include termination of employment, a demotion accompanied by a decrease in pay, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other circumstances peculiar to the particular situation. <u>Galabya</u>, 202 F.3d at 640.  However,

"[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).

A plaintiff may raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (citing Int'l Bhd. of Teamsters v. U.S., 431 U.S. 324, 335 n.15 (1977)). To establish disparate treatment, the plaintiff must show that the person to whom she compares herself is similarly situated in "all material respects", though she is not required to show that they are identical. Id. at 39–40. Consequently, where there are many distinctions between the situations of the plaintiff and the employees to whom she compares herself, the plaintiff and those employees are "not similarly situated in material respect . . . because the defendant's treatment of those [other] employees ha[s] no logical relevance to the plaintiff's claims." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001). A plaintiff may also establish pretext by evidence of disparate treatment. McDonnell Douglas, 411 U.S. at 804; see also Ellis v. Long Island Rail Road Co., No. 05-CV-3847 (FB) (KAM), 2008 WL 838766, at *4 (E.D.N.Y. Mar. 31, 2008) (citing Collins v. New York City Transit Auth., 305 F.3d 113, 119 n.1 (2d Cir. 2002)). Here, Divers alleges a variety of discrete discriminatory acts and I will discuss each one in turn.

*a. Denial of Transfer Requests.* The parties agree that Divers' first transfer request, which she made only two days after she started at Long Term, was denied, but dispute what occurred with respect to her subsequent requests. Divers alleges that she made numerous subsequent requests to transfer and that they were all denied except for one offer to transfer, which she declined. MJHS asserts that it offered Divers two positions on two separate occasions

after she completed one year at Long Term and that it never denied her a position for which she actually applied. Divers asserts that the various alleged transfer denials amount to discriminatory adverse employment actions.

Whether a decision to transfer or not to transfer an employee constitutes an adverse employment action depends largely upon the unique circumstances of the case. <u>Compare</u> <u>Williams v. H.R. Donnelly Corp.</u>, 368 F. 3d 123, 128 (2d Cir. 2004) (denial of transfer that would have enabled plaintiff to be close to home was not an adverse employment action) <u>with</u> <u>Beyer v. County of Nassau</u>, 524 F.3d 160, 164 (2d Cir. 2008) (denial of transfer to a position that required less training was an adverse employment action because the department plaintiff requested was receiving more work and newer equipment and the plaintiff's assigned department was rumored to be closing). However, the Second Circuit requires "objective indicia" that the "transfer denial created a materially significant disadvantage in the working conditions of the aggrieved employee." <u>Beyer</u>, 524 F.3d 160, 163–64 (2d Cir. 2008) (<u>quoting</u> <u>Williams</u>, 368 F.3d at 128). "[S]ubjective, personal disappointment" are not enough." <u>Williams</u>, 368 F.3d at 128. Rather, the plaintiff must offer "evidence from which a reasonable juror could conclude that the position to which she sought a transfer would have involved objective and significant improvements in her conditions of employment." <u>Id.</u> at 165.

It is undisputed that Divers first request to transfer, which she made after only one day at Long Term, was denied. However, unlike the cases in which a denied transfer has been held to constitute an adverse employment action, Divers never asked to be transferred to a specific position and thus was never denied a position for which she actually applied. Additionally, there is no evidence in the record establishing that any comparable positions for which she was qualified were even available. Thus, Divers has come forth with no "objective indicia" that a

jury could use to determine whether MJHS' handling of Divers' first transfer request "created a materially significant disadvantage" for Divers. Beyer, 524 F.3d at 163–64. There is no point of comparison to determine whether a transfer "would have objective and significant improvements" in Divers employment conditions. Id. at 165. Divers' claimed improvement is that a transfer would have allowed her to get away from Cambrini's discrimination. However, as discussed below, the record does not establish that Divers was being discriminated against. Moreover, since Divers had only been at Long Term for one day and had had only one racially neutral encounter with Cambrini, namely the note she found on her screen after returning from the restroom, there is insufficient evidence to lead a rational fact finder to determine that by denying that first transfer request, MJHS caused Divers to experience a materially significant disadvantage or denied her a materially significant improvement. To the extent that the record establishes that Cambrini was a difficult boss, it is simply insufficient to impose an obligation upon MJHS to transfer Divers away from her.

Additionally, though Divers asserts that her subsequent requests to transfer, which she made after at least one year at Long Term, were denied, the record indicates otherwise. Divers admitted in her complaint that MJHS offered her another comparable position but that she rejected it because it required weekend work and because it required her to work in the same building as Cambrini, though not necessarily under Cambrini's supervision. Though Divers asserts that other more desirable positions were available and that she was not offered those positions, she submitted no admissible evidence establishing these facts. Consequently, Divers claim of discriminatory transfer denials fails on the third element of the prima facie case.

Even if Divers could establish a prima facie case with respect to the transfer denials, MJHS has established a legitimate non-discriminatory basis for its decision. It is undisputed that

MJHS has a general policy against transferring employees before they have completed one year in a given department. This policy was included in MJHS' Human Resources Policies and Procedures handbook, which Divers admits receiving, and it also explicitly reserves the right to make exceptions to the policy. Divers has not proffered any evidence that would lead a reasonable juror to find that this explanation is a pretext for racial discrimination. She does not challenge the policy itself as discriminatory. Rather, to salvage her claim, she points to Dorothy Kourt, a white employee, who, unlike Divers, was permitted to transfer despite having worked less than one year in her previous position.

Here, Divers and Kourt are not sufficiently similar. Most significantly, as noted above, there is no evidence that a position to which Divers could have transferred was available at the time of her initial request whereas Kourt was transferred to fill a specific vacancy created by the newly established third CHN Supervisor position. Moreover, unlike Divers, who was denied a transfer she requested and that would not have served any particular need of the organization, Kourt was asked to transfer in order to alleviate Long Term's undisputed staffing crisis. Divers' claim of pretext also fails because she is unable to provide any other examples of disparate treatment with respect to MJHS' transfer policy. She identified no other black employees who were denied transfers and no other white employees who were preferentially transferred. This one instance of disparate treatment is not evidence sufficient to persuade a rational trier of fact to infer that MJHS's rationale for denying Divers' transfer was a pretext for discrimination. It would be particularly unreasonable to infer discrimination in this case when Divers was promoted into the very same position that she complains her white colleague was permitted to assume. Indeed, the record shows that Divers was one of at least two black females to hold the CHN Supervisor position. Thus, it light of MJHS's non-discriminatory promotion

decisions, it would defy logic to hold that MJHS engaged in unlawful discrimination with respect to the less important matter of transfers.

**b. Mishandling of Workers' Compensation claim**.  Divers also alleges that MJHS discriminated against her by withholding paperwork and thereby preventing her from obtaining a Workers' Compensation claim number after her January 2005 fall in an MJHS parking lot. MJHS denies mishandling Diver's application and produced a copy of the Workers' Compensation form prepared by MJHS on February 1, 2005, just six business days after the fall. (Pignataro Decl. Ex. A.)  Though Divers asserts that Cambrini purposefully withheld the report, she offers no admissible evidence challenging the report produced by MJHS or establishing that Cambrini or anyone at MJHS intentionally mishandled the claim in any manner.  Moreover, even if there was evidence that the report was mishandled, it would not constitute an adverse employment action as any delay in benefits that may have been caused by the mishandling would amount to a "mere inconvenience of employment" rather than a "material alteration in the terms and conditions of employment."  Consequently, Divers cannot make the necessary prima facie showing of adverse employment action with regard to this incident.

**c. Denial of time off to attend semi-weekly doctor's appointments and denial of light duty.**  Divers' third claim of discriminatory adverse employment action stems from MJHS's denial of Divers' request for leave to attend physical therapy sessions.[6]  Divers requested permission to miss several hours of work on one day every other week between January and June 2005.  She also alleges that MJHS discriminated against her by denying her unrelated request for "desk duty" or "light duty" in accordance with her doctor's recommendations while making the same accommodation for white employees.  MJHS admits denying both of these requests and implicitly concedes that they were adverse employment actions.  However, it asserts that it

---

[6] This allegation is also the basis of Divers' FMLA claim which will be discussed separately, *infra*.

denied the leave request because Divers gave no reason why she could not attend the appointments outside of the workday and because Fridays were a critical operating time and denied the light duty request because Divers would not have been able to perform the essential functions of her job on light duty.

To establish that these decisions were motivated by unlawful discrimination, Divers asserts that her white colleagues were permitted such accommodations. However, she has identified no evidence of that fact. Divers asserts that a white colleague, Raymond Lierman, was permitted to take time off for doctor's appointments. She has submitted no evidence of the circumstances of Lierman's alleged time off, no indication as to the basis of her knowledge regarding his time off, and no evidence to corroborate that he was in fact granted time off. Consequently, there is nothing in the record that could lead a rational fact finder to conclude that MJHS's denial of Divers request to miss a substantial part of the day every other week for six months gives rise to an inference of discrimination. This is particularly true in light of the fact that Divers admits that she was able to receive medical leave on every other occasion on which she requested it, including a period of ten days absence from work for injuries after a car accident and a four to six week absence for recovery from a surgical procedure.

Similarly, Divers asserts that her white colleagues were permitted to work at MJHS despite being restricted to their desks because of casts. However, she offers no evidence supporting this claim. Two of the three people she identified as having been preferentially treated, Ivy Brown and Carol Henry, are black females and thus Divers cannot claim disparate treatment based on their experiences. Moreover, both Brown and Henry submitted affidavits stating that their jobs are primarily desk jobs, that they never requested light duty or desk duty, and that they never wore casts or leg braces to work. Divers only identified the third employee

who she claims was treated differently, Barbara, by first name and described her as a secretary. Putting aside the fact that Divers has proffered no admissible evidence whatsoever regarding Barbara, based on the little that is known about her, she also is materially different from Divers' and therefore her case is insufficient to raise an inference of discrimination based on disparate treatment. Assuming Barbara is white, as a secretary, light or desk duty would have little impact on her job as, unlike Divers, she would not be required to perform the physically demanding tasks required of a CHN Supervisor. Consequently, Divers is neither able to raise an inference of discrimination surrounding these two decisions, nor can she establish that the legitimate non-discriminatory reasons for the decisions proffered by MJHS were a pretext.

   ***d. Withholding of State Disability Benefits.*** Divers also alleges that MJHS withheld her private disability benefits. MJHS disputes this claim[7] asserting that though Divers submitted a claim for benefits to both the private benefits provider and the Workers' Compensation Board, she withdrew her claim for private benefits and was denied state benefits and therefore is not entitled to any funds. In their defense, MJHS submitted a copy of a handwritten letter from Divers to the private disability benefits provider in which Divers states that she is rejecting private benefits and that MJHS will return to the provider all benefit checks received on her behalf. Moreover, Divers admitted during her deposition that the Workers' Compensation Board denied her claim.

   Divers neither asserts nor submitted any evidence indicating that she reapplied for the private benefits after her state benefits were rejected. Based on her deposition testimony, it appears that she believes that the private benefits should have been remitted to her automatically after the state denied her claim. This is unsupported in the record and seems unlikely, however,

---

[7] Defendants did not specifically address this claim in their memorandum of law but they submitted responsive evidence in the form of affidavits and deposition testimony to the Court.

even assuming Divers is correct, MJHS's failure to forward the funds to Divers does not give rise to an inference of discrimination. There is no evidence that MJHS regained possession of the funds or that Divers ever demanded the funds from MJHS. Moreover, though Divers asserts that other similarly situated white employees were able to receive their benefits, she provided no admissible evidence establishing whether and how white employees were treated differently with respect to benefits. Finally, Divers admits receiving benefits without issue on other occasions. Thus, Divers cannot establish a prima facie case of discrimination with respect to this claim.[8]

## 2. Hostile Work Environment Claim

In addition to the above discrete acts, Divers also alleges that Cambrini and MJHS are liable for creating a racially hostile work environment. To defeat a motion for summary judgment on a claim of racially hostile work environment, "a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted). A plaintiff must produce evidence that could lead a reasonable jury to conclude that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse." Schiano v. Quality

---

[8] Divers alleges three additional discrete acts of discrimination that are not assessed here because they are not properly before the Court. For the first time in her papers in opposition to summary judgment, Divers alleged (1) that she was forced to transfer to a social worker position in late 2000 or early 2001; (2) that MJHS issued her an ultimatum between transferring to the Manhattan branch or quitting in 2004; and (3) that MJHS prohibited her from cashing out her retirement account after she resigned from Long Term in 2006. Each of these allegations is a separately actionable wrong. However, since Divers did not raise them in her complaint or in an amended complaint, they are not properly before the court. See Longmire v. Wyser-Pratte, No. 05-CV-6725(SHS), 2007 WL 2584662, at *13 (S.D.N.Y. Sept. 6, 2007); cf., Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 127 S.Ct. 2162, 2175 (2007) ("When employee alleges serial violations of Title VII's proscription against employment discrimination, i.e. series of actionable wrongs, as opposed to hostile work environment, timely Equal Employment Opportunity Commission (EEOC) charge must be filed with respect to each discrete alleged violation.") Moreover, since Divers' transfer to a social worker position occurred in 2001, at the latest, and she filed her lawsuit in 2006, this claim is also time-barred under the four-year statute of limitations period for § 1981 claims. See Richey v. New York City Transit Auth., No. 07-CV-3711 (SLT) (LB), 2008 WL 4185877, at *2 (E.D.N.Y. Sept. 9, 2008).

Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the workplace." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment but may if sufficiently severe. See id.; Kemp v. A & J Produce Corp., 164 Fed. Appx. 12, 14 (2d Cir. 2005); Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000).

While "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." Svenningsen v. Coll. of Staten Island, No. 01-CV-7550 (SJ), 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 23, 2003) (citing Gregory v. Daly, 243 F.3d 687, 694–95 (2d Cir. 2001)). "Everyone can be characterized by . . . race . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano v. Costello, 294 F.3d 365, 377 (2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." Alfano, 294 F.3d at 378. In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Divers alleges that during her tenure at Long Term, Cambrini created a hostile working environment by treating her in a generally rude manner. She asserts that Cambrini harassed, marginalized, and intimidated her. In addition, Divers alleged a number of concrete examples of hostile treatment from Cambrini. The first such incident occurred on Divers' first day under Cambrini when Cambrini left her a note stating that she needed to know where Divers was at all times including when Divers took a restroom break. The most significant incident was the July 13, 2006 confrontation that erupted after Divers and Cambrini both assigned a nurse to the same patient. In addition, Divers asserts that Cambrini would toss papers and files on her desk instead of handing them to her, once called her a bitch, shouted at her constantly, did not believe her when she reported her slip on the ice, and called her at home while she was out sick to inquire about a case that had not been attended to.

Applying the Harris factors, there is little if any evidence to establish that these conditions were "sufficiently severe or pervasive to alter the conditions of" Divers' employment. Cruz, 202 F.3d at 570. The specific incidents alleged were infrequent given Divers' more than two year tenure under Cambrini. Additionally, none of the conduct was particularly severe. Shouting and tossing papers and files may be a rude breach of etiquette but it is hardly sufficient to alter one's working conditions and Divers does not allege that it interfered with her relationship with other employees and supervisors. Indeed, she admits that she had a good working relationship Cambrini's co-supervisor Sandra Schau. Similarly, Cambrini calling Divers a liar on one occasion and a bitch on another at most amount to "mere offensive utterenace[s]," which are not within the purview of § 1981. Harris, 510 U.S. at 23; see also

Faragher, 524 U.S. at 788 (offhand comments do not amount to discriminatory changes in the terms and conditions of employment). Divers also does not allege that the conduct was humiliating in the sense that it diminished her standing among other employees or embarrassed her. In her exit interview, though Divers indentified Cambrini as her primary reason for leaving Long Term, she lodged no complaints about any other aspect of her job and reported many positive aspects. Thus, what Divers describes is not a pervasively hostile work environment but rather a substantially typical work environment marred by a personality conflict with a single individual.

The July 13, 2006 confrontation between Divers and Cambrini, the most serious allegation, also does not establish a hostile work environment claim, whether by itself or in conjunction with the Divers' other complaints. The incident notably took place after Divers had already resigned. Moreover, while the most serious of Divers' varying accounts of the incident does describe physical contact, it was an isolated occurrence insufficient to trigger § 1981. See Aina v. City of New York, No. 05-CV-7553 (SHS), 2007 WL 401391, at *6 (S.D.N.Y. Feb. 6, 2007) (incident in which defendant slammed the door in such a violent manner it almost hit plaintiff's knees was insufficient to sustain a hostile work environment claim in the absence of even a single additional occurrence of alleged physical aggression from defendant it was isolated and inconsequential) Ricks v. Conde Nast Publications, Inc., 92 F. Supp. 2d 338, 348 (S.D.N.Y., 2000) (holding that allegation that defendant hit plaintiff on shoulder and pushed her out of her office was insufficiently severe to establish a hostile work environment claim).

However, even assuming that a reasonable juror could find in favor of Divers on this point based on the current record, Divers cannot withstand summary judgment because her evidence fails to establish an inference of racial discrimination. All of the incidents Divers

described were racially neutral.  To make the necessary linkage to race, Divers relies on her own deposition testimony and declaration as well as the affidavit of Veronica Lowe.  This evidence is inadequate to raise an inference of racial discrimination.

Divers' deposition testimony and declaration contain no "concrete particulars" but rather are comprised entirely of speculation as to the motives behind Cambrini's harsh treatment.  Moreover, most of her speculation is irrelevant to the § 1981 racial hostility claim as it concerns her totally unsupported theory that Cambrini was romantically interested in either Divers or Tyisha Dukes.  Throughout her complaint and declaration Divers makes general statements that white employees were not subjected to the same treatment as she, such as "No white employee needed permission to use the bathroom", "Similarly situated white employees normally received their worker's claim number in about a week of an incident", and "Similarly situated white employees receive their disability benefits as soon as they put a claim for same."  (Divers Decl. ¶ 8, 12, 14.)  They are also rife with conclusory statements asserting that the conduct was discriminatory and motivated by her race.  However, except for the matter of Dorothy Kourt's transfer discussed above, she offers no evidence, admissible or otherwise, to substantiate these assertions. Further, nowhere in her deposition testimony or declaration does she identify her basis for ascribing Cambrini's conduct to racial animus.  Given that Divers herself is unable to articulate what, other than her personal belief, ties Cambrini's conduct to unlawful discrimination, it certainly is not a conclusion that can be reached by a rational jury.  See Moore v. New York State Div. of Parole, No. 06-CV-1973 (CPS) (JO), 2008 WL 4394677, at *10 (E.D.N.Y. Sept. 23, 2008) ("Plaintiffs conclusory allegations provide an insufficient basis from which to infer that the defendants' facially neutral acts were discriminatory."); Payne v. MTA New York City Transit Auth., 349 F. Supp. 2d 619, 627 (E.D.N.Y. 2004) (plaintiff's

"unsubstantiated, subjective belief, as embodied in his deposition testimony" that employer attempted to remove him from his position because of his race insufficient to withstand summary judgment); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.") (citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

Veronica Lowe's affidavit is similarly insufficient to raise a reasonable inference that Cambrini's facially neutral acts were motivated by racial animus. Lowe, a black female, assumed the CHN Supervisor position two months after Divers left MJHS. Thus, she did not work at Long Term at any point during Divers' tenure there. Her affidavit is eleven sentences long. In it, she states that she resigned from Long Term after nine months because Cambrini subjected her to a racially hostile environment. She includes general statements supporting Divers' complaints about Cambrini's condescending manner and states that she "suffered the same fate that Catherine Divers alleged that she suffered in the hands of Cambrini and MJHS." (Lowe Aff. ¶ 4). Like Divers' statements, Lowe's affidavit consists largely of conclusory allegations and personal opinions. She makes only two statements that approach concrete evidence. She asserts "Cambrini was clearly discriminating against me because I was made to do most of the less sought after field work while my white Colleagues sat in the office doing very little paper work," and "I and other black employees were repeatedly yelled at for something a white employee will suffer no such fate [sic]." (Lowe Aff. ¶ 2, 3.) Lowe does not elaborate on either of these allegations. She provides no information regarding whether the white colleagues she refers to had equivalent job duties or were otherwise similarly situated to her and no specific examples of the conduct she describes. Consequently, Lowe's affidavit is also insufficient to raise a reasonable inference of racial discrimination. See Hester v. BIC

Corp., 225 F.3d 178, 182 (2d Cir. 2000) ("in an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision"); see also Moore, 2008 WL 4394677, at *10 (affidavit stating coworker's personal belief that plaintiff and other employees were discriminated against because of their race and gender where other evidence was facially neutral was insufficient to withstand summary judgment); Minus v. West, No. 99-CV-7229 (JG), 2003 WL 21295122, at *4 (E.D.N.Y. 2003) (coworker's conclusory allegation that employer "did not want blacks in his office" was insufficient to withstand summary judgment).

Additionally, in this case, the lack of evidence creating an inference of discrimination is highlighted by the undisputed facts that Cambrini hired Lowe and Sylvester, who is also black, for the same position as Divers and that Cambrini gave Divers a good performance review which led to a high raise. While the record does suggest that Cambrini may have been aggressive and abrasive toward her employees, § 1981 does not exist to resolve personality conflicts.

Summary judgment as to MJHS' hostile work environment liability is further warranted in light of the Faragher/Ellerth affirmative defense. Under this defense, an employer may not be held vicariously liable for a supervisor's harassment provided that the harassment did not culminate in a tangible employment action. To successfully assert this defense the employer must establish: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006). Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure, the burden of production shifts to the employee to come

forward with one or more reasons why the employee did not make use of the procedures. The employer may rely upon the absence or inadequacy of such a justification in carrying its ultimate burden of persuasion. See Leopold v. Baccarat, Inc., 239 F.3d 243, 246 (2d Cir. 2001).

Here, it is undisputed that MJHS took reasonable steps to prevent and cure harassing behavior by disseminating and enforcing an anti-harassment policy and that Divers was aware of the complaint procedure. Additionally, Divers also does not dispute that she failed to lodge any formal complaints of discrimination until after her resignation. Divers justified her official silence by claiming that she feared retaliation. However, except for her own conclusory statements, there is no evidence in the record substantiating these fears. Consequently, MJHS has established an affirmative defense as a matter of law. See id. ("A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.").

## 3. Constructive Discharge Claim

Divers also alleges that MJHS constructively discharged her. She primarily asserts that MJHS is liable for constructive discharge as a result of the hostile work environment created by Cambrini but also suggests that MJHS deliberately attempted to force her to resign by posting a CHN Supervisor opening while she was on medical leave. Here, again, there is no dispute that plaintiff has established the first and second elements of the prima facie case i.e. that she is a member of a protected class and that she was qualified to perform her job. However, defendants assert that Divers' working conditions were not so difficult or intolerable as to prompt a reasonable person to resign.

A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.  See Lopez v. S.B. Thomas, 831 F.2d 1184, 1188 (2d Cir. 1987) (citation and quotation marks omitted).   "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  Pennsylvania State Police v. Suders, 542 U.S. 129, 130 (2004).  Thus, to prevail on a claim of constructive discharge based on hostile work environment, plaintiff must establish "something more" than the level of conduct that would give rise to a hostile work environment claim.  See Id. at 146–47; see also Steele v. Schafer, 535 F.3d 689, 694–695 (D.C. Cir. 2008); Ternullo v. Reno, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998) ("to demonstrate constructive discharge, the plaintiff must demonstrate harassment that is more severe and pervasive than that required to show a hostile work environment.").  Conditions that precipitate an involuntary resignation "may be effected through coworker conduct [or] unofficial supervisory conduct."  Suders, at 131.

Here, there is a genuine factual dispute regarding whether Divers' resigned because she subjectively perceived hostility or because she wanted to relocate to Rochester.   However, Divers' constructive discharge claim fails on other grounds.  First, since Divers fails to make the threshold showing of severe or pervasive conduct necessary to support a claim for hostile work environment, she can neither survive summary judgment on the constructive discharge claim, which requires evidence of even more severe conditions.  See Suders, 542 U.S. at 146–47; see also Spence v. Maryland Cas. Co., 995 F.2d 1147, 115–52, 1156–57 (2d Cir. 1993) (plaintiff failed to state a constructive discharge claim where employer repeatedly criticized the plaintiff's

work performance and style, yelled at plaintiff in front of others, pounded his fist on a table, and repeatedly threatened to fire plaintiff).

Moreover, Divers' has not proffered evidence supporting the fourth element of the prima facie case, namely that the conduct and conditions that allegedly prompted her resignation give rise to an inference of discrimination. As discussed above, all of the factors that Divers asserts created an intolerable working environment were facially neutral and Divers has not submitted any evidence linking those factors to race discrimination. Additionally, MJHS has produced evidence indicating that they wanted to continue to employ Divers because of the staffing difficulties they were experiencing and were burdened by her resignation. While Divers refutes this claim, she has submitted no admissible evidence to the contrary. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000) (affirming grant of summary judgment to employer on employees' constructive discharge claim under § 1981 in part because the defendant had demonstrated an interest in continuing to employ plaintiffs); Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983) (same).

## C.  **FMLA Claim**

Divers final federal claim alleges that MJHS violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et. seq., when it denied her requests to leave work early or come into work later every other Tuesday or Friday over a six-month period. Under the FMLA, eligible employees are "entitled to a total of 12 workweeks of leave during any 12-month period for . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

The parties provided little elaboration regarding this claim. MJHS argues that Divers did not satisfy the requirements of asserting an FMLA claim because she did not work with MJHS to

create a schedule that would decrease that burden of her absence as she is obliged to do under the FMLA regulations promulgated by the Department of Labor. Neither side provided any case law supporting their positions. Though Divers' counsel mentioned the claim and stated the facts surrounding it in the memorandum of law, he offered no legal analysis or argument. Nevertheless, the record before the Court is sufficient to reach a conclusion regarding summary judgment.

To state a prima facie claim for interference with FMLA rights, Divers must demonstrate that: 1) she was an eligible employee under the FMLA; 2) MJHS is an employer under the FMLA; 3) Divers was entitled to leave under the FMLA; 4) Divers gave notice to MJHS of her intention to take leave; and 5) Divers was denied benefits to which she was entitled under the FMLA. See Garraway v. Solomon R. Guggenheim Found., 415 F. Supp. 2d 377, 382 (S.D.N.Y. 2006).

MJHS argues that Divers was not eligible for FMLA leave because she did not work with MJHS to create a schedule that would decrease the burden of her absence, as she was obliged to do. The FMLA does impose a duty on employees to "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee." 29 U.S.C. 2612(e); see also 29 C.F.R. § 825.117 ("Employees needing intermittent FMLA leave or leave on a reduced leave schedule must attempt to schedule their leave so as not to disrupt the employer's operations."); 29 C.F.R. § 825.302(e) (same). MJHS asserts that Divers' request was unduly burdensome because she wanted time off during a critical operating time and gave no reason why she could not see her doctor outside the workday. However, in her deposition testimony, Divers implies that no appointments were available during non-work hours and there is no evidence that MJHS

proposed any less burdensome alternatives to Divers. Consequently, assessing the facts in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether Divers satisfied her duty to make efforts to avoid disrupting MJHS operations.

Divers FMLA claim fails for two other reasons however. As a threshold matter, the FMLA section that Divers asserts her claim under is applicable only to employees with a "serious health condition." The evidence in the record falls short of satisfying the definition of a "serious health condition."[9] Divers has submitted no evidence to establish that the leave she sought was either necessary or that her condition was serious within the meaning of the FMLA. Indeed, aside from her own self-serving affidavit and deposition testimony, which does not even name or describe the condition she was suffering from, she submitted no medical evidence whatsoever. Given the complete lack of evidence supporting the necessity of her treatments or the severity of her condition, there is no genuine issue of material fact for a jury to resolve. See Haefling v. United Parcel Service, Inc., 169 F.3d 494, 500 (7th Cir. 1999) (dismissing FMLA claim on summary judgment where plaintiff failed to submit medical evidence or physician's affidavits establishing that physical therapy sessions were required or that the condition was severe).

Divers' FMLA claim must also fail because, even assuming that the leave request at issue qualified under the FMLA, the record reveals that Divers' request was not denied under FMLA

---

[9] The statutory definition of a "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves: (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). This concept is further developed in the FMLA Regulations, which divides that phrase into two categories: conditions treated via inpatient care and conditions requiring continuing treatment. Continuing treatment is defined as treat for incapacity, which is defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom" and is further divided into five categories. The inpatient care category is clearly inapplicable here. Of the five types of continuing treatment designations, only the fifth has potential relevance here. It provides that a serious medical condition requiring continuing treatment includes "any period of absence to receive multiple treatments . . . by a health care provider . . . either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis)."

standards.  Divers admits that she was able to use her vacation and sick leave to attend the physical therapy appointments for which she now claims she was denied leave.  The FMLA Regulations permit such a substitution of paid leave for FMLA leave, which is usually unpaid. 29 C.F.R. § 825.207(a) ("the employer may require the employee to substitute accrued paid leave for FMLA leave"); 29 C.F.R. § 825.207(c) ("Substitution of paid accrued vacation, personal, or medical/sick leave may be made for any (otherwise) unpaid FMLA leave . . .").  Consequently, Divers cannot succeed in her FMLA claim as a matter of law.

**D. State Law Claims**

Having concluded that Divers § 1981 and FMLA claims must be dismissed, the Court declines to exercise supplemental jurisdiction over plaintiff's various state law claims.  See In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 61 (2d Cir. 1998) ("This Court and the Supreme Court have held that when the federal claims are dismissed the 'state claims should be dismissed as well.'") (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

## III. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment on plaintiff's federal claims is granted. The Court declines to retain jurisdiction over plaintiff's remaining state law claims and dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

Dated: January 14, 2009
       Brooklyn, New York

_____/s/_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE